Gaston LaFAILLE, Petitioner,

v.

**BENEFITS REVIEW BOARD, UNITED STATES DEPARTMENT OF LABOR;** Director Office of Workers' Compensation Programs, United States Department of Labor, General Dynamics Corporation, and Insurance Company of North America, Respondents.

No. 977, Docket 88–4160.

United States Court of Appeals, Second Circuit.

Argued April 4, 1989.

Decided Aug. 22, 1989.

Carolyn P. Kelly, Groton, Conn. (O'Brien, Shafner, Bartinik, Stuart & Kelly, P.C., Groton, Conn., Matthew Shafner, of counsel) for petitioner.

Samuel J. Oshinsky, Washington, D.C., (Benefits Review Board, U.S. Dept. of Labor, Linda Meekins, Clerk, Washington, D.C., of counsel), for Benefits Review Bd.

Joshua T. Gillelan II, Atty., U.S. Dept. of Labor, Office of the Sol., Washington, D.C. (Jerry G. Thorn, Acting Sol. of Labor, Carol A. De Deo, Donald Shire, Associate Solicitors, J. Michael O'Neill, counsel for Longshore, of counsel), for the Director, Office of Workers' Compensation Programs.

Richard N. Curtin, Boston, Mass., (Parker, Coulter, Daley & White, Boston, Massachusetts, of counsel), for Insurance Co. of North America.

Before LUMBARD, PRATT and MINER, Circuit Judges.

LUMBARD, Circuit Judge:

Gaston LaFaille, who suffered several lung collapses while employed as a welder by General Dynamics Corp., appeals from a final order of the Benefits Review Board on his claim for disability benefits. The Board affirmed a decision of an Administrative Law Judge (ALJ) denying him permanent partial disability compensation and granting him temporary partial benefits based on his average weekly wage at the time he suffered the first lung collapse. LaFaille, proceeding under § 21(c) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 921(c), makes three claims of error in the Board's decision of February 10, 1986, which remanded the case in part, *LaFaille v. General Dynamics Corp.*, 18 Ben.Rev.Bd.Serv. (MB) 88 (1986), and the Board's subsequent affirmance on October 31, 1988 of the ALJ's decision on remand.

LaFaille first claims that the Board contravened the express language of § 10(i) of the LHWCA, 33 U.S.C. § 910(i), by directing the ALJ to use the date immediately prior to his injury, rather than the date on which he first became aware that his respiratory impairment was occupational in origin, to determine his average weekly wage. Second, he claims, and the Director of the Office of Workers' Compensation Programs of the United States Department of Labor (the Director) agrees, that the Board exceeded its review authority and erred in holding that he suffered no permanent partial loss of earning capacity and in not adjusting his post-injury earnings for inflation. General Dynamics and its insurer, the Insurance Company of North America (hereinafter collectively General Dynamics), however, claim that the Board acted properly. Third, LaFaille and the Director argue, and General Dynamics disagrees, that the Board erred in denying him a *de minimis* award because his injury left him with a permanent physical impairment which, although not currently reflected in a loss of earnings, is likely to affect his earnings in the future. We agree with all of LaFaille's claims and therefore remand for a redetermination of his benefits.

Gaston LaFaille worked as a welder for General Dynamics's shipbuilding plant in Groton, Connecticut, from May 1961 to August 1969. He constructed and repaired submarines in the wet docks at the shipyard. LaFaille was assigned a number of difficult welding jobs in tightly enclosed spaces aboard submarines, where he was exposed to particularly high concentrations of fumes and gases. He was also regularly exposed to asbestos, which he wrapped around his body to avoid being burned while welding. In addition, LaFaille regularly inhaled particles created by grinders smoothing out steel surfaces on the ships and by adjacent workers who cut and installed asbestos aboard the submarines. He left General Dynamics in August 1969, when he was earning an average weekly wage of $146.80, to work as a welder for two non-maritime employers in Connecticut, where he remained until 1977.

Starting on February 9, 1977, LaFaille suffered a series of three lung collapses. After the first two lung collapses, doctors succeeded in reinflating the lung with a

chest tube. After the third occurrence on April 5, 1977, however, a thoracotomy was performed which revealed pulmonary emphysema and fibrosis. Following his release from the hospital, he was totally disabled from April 5, 1977 until July 17, 1978, when he returned to work for General Dynamics as a welder.[1]

After his return to work in July of 1978, LaFaille was substantially weaker. He left General Dynamics in February 1979 because the job required too much heavy physical exertion and exposure to welding smoke. He then worked as a welder and pipe-fitter at a power plant in Connecticut. This job was less physically demanding because he was assigned to relatively cleaner pipe-fitting work and his employer and co-workers were sympathetic to his needs. LaFaille's tax records reflect that he made the following:

| 1974 | $19,785.00 |
| 1975 | $21,014.00 |
| 1976 | $24,469.00 |
| 1977 | $17,087.00 |
| 1978 | $13,549.00 |
| 1979 | $24,879.00 |

Subsequent medical examinations established that LaFaille's recurrent lung collapses were caused by a complication of obstructive airways disease, resulting in part from his exposure to welding fumes and gases and his inhalation of asbestos dust during his eight years at General Dynamics. Even after his recovery from the 1977 thoracotomy, LaFaille still suffers from underlying progressive lung disease; he remains prone to incidents of lung collapse and lacks the strength to reach the tight locations where he previously welded.

LaFaille first became aware in early 1979 of the relationship between the conditions of his employment at General Dynamics and his impairment upon reading a newspaper article on the prevalence of similar diseases among workers exposed to asbestos. He then retained a lawyer who, on April 18, 1979, filed a report of accident and a claim with General Dynamics seeking disability compensation for his occupational disease.

*Findings of the Administrative Law Judge*

After conducting a formal hearing in February 1982, ALJ Robert Glennon issued a decision in November 1982. The ALJ awarded LaFaille temporary total disability benefits for the period from May 12, 1977 to July 17, 1978 under § 8(b) of the LHWCA, 33 U.S.C. § 908(b), to compensate LaFaille for wages lost due to occupational injury. Section 10 provides for such compensation to be based on the worker's average weekly wage "at the time of the injury" and sets forth a scheme for determining the date upon which to measure the injured employee's lost wages in order most closely to approximate the loss. The ALJ accordingly calculated LaFaille's compensation on the basis of his average weekly wage at the time of his last exposure to the toxic materials at General Dynamics in 1969, in accordance with the then-existing § 10(b).

Although the ALJ found that LaFaille had sustained a permanent, progressive physical impairment, he denied him any continuing award for permanent partial disability after his 1978 return to work because his average weekly wage of over $400.00 after his recovery demonstrated no loss of earning capacity when compared to his average wages of $146.80 in 1969, when he had last worked for General Dynamics.

*The Benefits Review Board Decision*

The parties appealed to the Board. LaFaille and the Director argued that the ALJ's award should be revised in light of Congress's intervening 1984 addition of § 10(i) of the LHWCA, 33 U.S.C. § 910(i).[2] Congress therein provided that when the occupational disease does not immediately result in disability, the average weekly wage should be based on the employee's

---

1. The ALJ expressly found that the period of temporary total disability began on April 5, 1977, but without explanation ordered payment only for the period beginning on May 12, 1977. No issue concerning that five-and-a-half-week hiatus, however, has been preserved or presented for review and we therefore do not address it.

2. Pub.L. No. 98–426, 98 Stat. 1639, 1647 (Sept. 28, 1984).

income, not as of the date of his last exposure to the deleterious substance, but as of the date he first becomes aware of the occupational cause of his disability. LaFaille and the Director therefore argued that the Board should determine his temporary total disability benefits under § 10(i), rather than base the benefits on LaFaille's income in 1969, when he was last exposed to the noxious materials at General Dynamics. Second, LaFaille and the Director argued that the ALJ erred in denying benefits for permanent partial disability. The insurance carrier cross-appealed, arguing that LaFaille's last exposure prior to any alleged permanent partial disability occurred in 1978, not 1969, and that, because General Dynamics was self-insured in 1978, the carrier would not be responsible for permanent partial disability benefits.

In February 1986, the Board vacated the ALJ's ruling, which had held that the "time of the injury" was the time in 1969 of LaFaille's last exposure to fumes at General Dynamics. The Board declined, however, to use the date of awareness to calculate his average weekly wage, as dictated by the literal language of § 10(i) enacted in 1984. Instead, relying on a Congressional Conference Report accompanying the 1984 amendments, it applied the standard of § 10(c) and determined LaFaille's average weekly wage as of the period immediately preceding the first lung collapse in 1977, reasoning that use of that date to calculate lost earnings would more accurately compensate LaFaille for the wages he actually lost. The Board therefore remanded to the ALJ to determine LaFaille's average weekly wage in 1977, prior to the onset of his disability, and enter a revised award for temporary total disability accordingly.

Comparing his earnings of $24,469 in 1976, prior to his temporary total disability, and his earnings of $24,879 in 1979, the Board affirmed the ALJ's ruling that LaFaille had no residual permanent loss of earning capacity after his return to work in 1978. The ALJ's ruling had been based on a comparison between his 1969 wages and his wages upon returning to work after his operation. The Board stated that the ALJ did not need to calculate and compare La-

Faille's post-recovery average weekly wage to his wages at the onset of his accident in 1977 in order to determine whether he had sustained any permanent loss of earning capacity. The Board further refused to adjust LaFaille's post-recovery earnings for inflation because of the steady rise in his income after the injury. One member of the Board dissented, maintaining that LaFaille's 1979 earnings should be adjusted for inflation and that it was the ALJ's, and not the Board's, role to determine whether LaFaille had sustained a residual loss of earning capacity.

Finally, the Board denied LaFaille a *de minimis* award of continuing compensation. It held that such awards are judicially created extensions of the modification period prescribed under LHWCA § 22 and therefore infringe upon the province of the legislature.

On remand, on May 18, 1988, the ALJ determined that LaFaille's average weekly wage as of April 1977, at the onset of his injury, was $423.08 and awarded him temporary total disability benefits for the period from April 12, 1977 to July 17, 1978. The ALJ did not determine whether LaFaille's post-injury wage-earning capacity was less than this average weekly wage because the Board had itself determined that he sustained no loss in earning capacity on the basis of his earnings in 1977 as compared to those in 1978 and 1979.

After LaFaille appealed again, the Board, on October 31, 1988, summarily affirmed the ALJ's decision, from which order LaFaille now appeals.

*The Date On Which To Calculate The Average Weekly Wage*

█ The first issue is whether the Board erred in ordering the ALJ, on remand, to use the average weekly wage as of the date of the onset of the disability in 1977, in accordance with § 10(c) of the LHWCA, 33 U.S.C. § 910(c), rather than the wage as of the date of awareness, as prescribed by the 1984 addition of § 10(i), 33 U.S.C. § 910(i). LaFaille claims that he is prejudiced by the Board's ruling because his average weekly wage of $423.08 at the

onset of his accident in 1977 is about $55.00 less per week than his average weekly earnings of $478.44 at the date of awareness in 1979. Section 10(i) applies when, as in LaFaille's case, the "occupational disease ... does not immediately result in ... disability" and requires the employee's award to be based on his average weekly wage as of "the date on which the employee ... becomes aware ... of the relationship between the employment, the disease, and the ... disability." Section 10(c), on the other hand, applies whenever neither the employee's average daily earnings in the year immediately preceding the time of injury, as calculated under § 10(a), nor the average daily earnings of similar workers in that year, as calculated under § 10(b), reasonably reflect his lost earning capacity due to the injury. In such a case, § 10(c) requires annual earning capacity to be based on

> the previous earnings [i.e.—pre-disability earnings] of the injured employee in the employment in which he was working at the time of the injury, ... or other employment of such employee....

General Dynamics and the Director claim that an award granted to LaFaille under a literal application of § 10(i) would overcompensate him relative to the wages he actually lost due to his injury because it would be based on his average weekly wage in 1979, which was higher than that in 1977, when he was unemployed due to his lung collapses. General Dynamics avers that the application of § 10(c) is more in accordance with the purpose of the statute.

General Dynamics bases its contention on its view that § 10(c) was designed to apply to situations where no other subsection provides a sensible basis for recovery. It argues that, even though § 10(c) was not amended in 1984, it is a stopgap provision that is to be applied in lieu, not only of § 10(a) and § 10(b), but also of the subsequently added § 10(i), wherever an anomalous § 10 wage basis would result. In support of this argument, General Dynamics points to the Conference Committee Report accompanying the 1984 amendments.[3]

The conferees note, however, that a claimant may have suffered a wage loss attributable to an occupational disease prior to recognizing its relationship to employment. In such case, the conferees intend that the phrase of section 10(c), "other employment of such employee," shall be interpreted so that compensation shall be based upon the claimant's wages prior to any reduction attributable to the disability.

H.R.Rep. 98–1027, 98th Cong., 2d Sess. 30, 1984 U.S.Code Cong. & Admin.News 2771, 2780 (1984).

Among the anomalies that would result if § 10(c) were not applied in lieu of § 10(i) is the scenario described by General Dynamics in which an employee becomes disabled before suffering a wage loss attributable to his disease, but recognizes the occupational origin of the disease only after retirement or after accepting a lower paying job. Section 10(i) would give him nothing. General Dynamics also maintains that had LaFaille become aware of the source of his disease a year earlier while totally disabled, he would have suffered a similarly anomalous fate under this section of having an average weekly wage of zero.

While we agree that the literal application of § 10(i) may produce anomalous results in certain situations, we think that the Board should have applied § 10(i), which requires the time of injury to be measured from the date of awareness, does not produce an unjust result in this case and does not in any way contravene the statute's compensatory purpose.

Congress was aware that a mechanical application of the date of awareness under § 10(i) could sometimes result in the undercompensation of a worker who earned less at the date of awareness than at the onset of the disease. The Conference Report addresses this by specifying that where the claimant suffered a wage loss prior to the date of awareness, the date of the onset of the disability should be used instead. The Report does not, however, state that this date should be used in all cases where

---

3. H.R.Rep. 98–1027, 98th Cong., 2d Sess. 29–30, 1984 U.S.Code Cong. & Admin.News 2771.

disability precedes awareness—only where there is a wage loss. Although LaFaille was out of work for a period of fourteen months after his operation, he did not suffer a wage loss under the Conference Committee Report, assuming that the Report may be used to carve out an exception to the statute, because this period of his unemployment ended in July 1978 and he was subsequently reemployed at the going rate until the date of awareness in 1979.

We also disagree with General Dynamics's contention that, because LaFaille made more in 1979, at the date of awareness, than in 1977, just before his injury, § 10(i) would pay LaFaille more than what he actually lost due to his accident. LaFaille's 1979 earnings are only nominally higher than his 1977 earnings and, when adjusted for inflation, may not prove to have been higher. An exception to the clear language of this subsection should not be made unless its literal application seriously counters the purpose of the statute. In any event, the Conference Report was designed to correct cases of plain undercompensation and does not apply to LaFaille. We therefore conclude that the ALJ should have applied § 10(i) to determine LaFaille's temporary disability benefits.

*The Board's Finding That LaFaille Suffered No Permanent Partial Disability*

 The second issue is whether the Board overstepped its authority by making the factual determination that LaFaille's earning capacity in 1979 showed no loss from the 1977 level and by not directing the ALJ on remand to determine LaFaille's residual earning capacity under LHWCA §§ 8(c)(21) and 8(h), 33 U.S.C. §§ 908(c)(21) and 908(h), for comparison with his 1977

average weekly wage.[4] General Dynamics argues that the Board's conclusion that LaFaille sustained no decrease in wage-earning capacity was based on substantial evidence, which consisted of his yearly earnings over several years and of the ALJ's original assessment of LaFaille's earning capacity in light of his age and the extent of his injury. General Dynamics maintains that LaFaille's post-recovery earnings are higher than his pre-injury earnings and, as the ALJ found that he did not meet his burden of establishing that his actual current wages do not reflect his true earning capacity, the Board was justified in concluding that he suffered no loss in earning capacity. We disagree, as does the Director, and find that the decision of the Board was not supported by substantial evidence.

The determination of post-injury wage-earning capacity in cases of permanent partial disability is governed by §§ 8(c)(21) and 8(h). Because LaFaille's injury is not of a kind specifically identified in the schedule set forth in §§ 8(c)(1)–(20), it falls under § 8(c)(21), which provides for compensation only if the disability lessens the employee's wage-earning capacity. Calculating the amount of disability under § 8(c)(21) requires a comparison of the claimant's pre-injury average weekly wage with his post-injury wage-earning capacity.

Thus, in order to make the comparison required to determine the amount of permanent partial disability under § 8(c)(21), LaFaille's pre-injury average weekly wage would need to be calculated as of 1977. The Board, however, decided LaFaille's permanent partial disability under § 8(c)(21) without knowing the 1977 pre-injury average weekly wage, as this issue had been

---

**4.** In computing permanent partial disability, the ALJ should not apply § 10(i), which would require taking LaFaille's average weekly wage as of 1979, when he became aware that his injury was job-related. Rather, the ALJ should apply § 10(c), computing permanent partial disability based on LaFaille's average weekly wage as of 1977, when his injury manifested itself. Congress could not have intended a different result, for the difference between pre-manifestation wages and post-manifestation earning capacity will almost always be a substantial and fair

figure, whereas the difference between pre-awareness wages and post-awareness earning capacity will be too small adequately to compensate an employee in most cases. In other words, a lung collapse commonly will take a worker from one level of wages to a much lower level of earning capacity, but awareness that the lung collapse was job-related will seldom take a worker from the already-reduced level of wages earned by one toiling with a sick lung to a significantly lower level of earning capacity.

remanded to the ALJ. It was not sufficient for the Board to determine that there was no permanent loss of earning power on the basis of LaFaille's income-tax calendar-year earnings from 1974 to 1979 and on the assumption that his post-injury average weekly wage was "approximately $400.00," since § 8(c)(21) requires a comparison between a definite dollar figure representing pre-injury average weekly wages with a definite dollar figure representing post-injury wage-earning capacity. *See Devillier v. National Steel and Shipbuilding Co.*, 10 Ben.Rev.Bd.Serv. (MB) 649 (1979). There was thus no basis for the Board's determination that LaFaille suffered no permanent partial disability.

Furthermore, by engaging in fact-finding and assuming that LaFaille's post-injury average weekly wage was "approximately $400.00," the Board precluded the ALJ on remand from considering evidence, other than LaFaille's nominal post-injury earnings, to determine his residual earning capacity under § 8(h). Section 8(h) provides that, in calculating permanent partial disability under § 8(c)(21), residual wage-earning capacity is determined from the employee's actual post-injury wages, unless they do not "fairly and reasonably represent his wage-earning capacity," in which case earning capacity is determined by,

> having due regard to the nature of [the employee's] injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

■ As the dissenting member pointed out, there are three reasons why the majority's simple comparison of LaFaille's income-tax calendar–1976 earnings with his income-tax calendar–1979 earnings may not accurately reflect comparison of his 1977 average weekly wage with his residual earning capacity. First, his earnings in the first three months of 1977 were at a higher rate than his 1976 earnings, and might therefore reflect a higher § 10(c) average weekly wage as of early 1977 than the calendar-year 1976 average. Second, the much higher rate of the calendar–1978 earnings, though he did not return to work until July of that year, than the calendar–1979 average, together with the evidence that LaFaille left his General Dynamics job in February 1979 because it was beyond his physical capacity, suggests that the 1979 average was inflated by a rate of income at the beginning of the year from work which LaFaille could no longer do. Third, when adjustments are made for inflation, even the 1976 and 1979 figures might show a loss in earning capacity. These considerations are not "creative calculations," as the Board suggests, because § 8(h) requires examination of "the totality of the evidence" relevant under § 8(h), not just the annual earnings alone, to determine residual earning capacity. It was the role of the ALJ, not the Board, to consider factors such as these pursuant to § 8(h) in determining whether there was a loss of residual wage-earning capacity. *Volpe v. Northeast Marine Terminals*, 671 F.2d 697, 701 (2d Cir.1982).

*Failure to Consider Inflation*

■ We also agree with LaFaille's claim that the Board was required to express its finding of residual earning capacity in terms of the time-of-injury equivalent of the residual earnings, since general wage increases and inflation would otherwise distort the comparison required under § 8(c)(21) of the sums arrived at under §§ 10 and 8(h). *See Bethard v. Sun Shipbuilding and Dry Dock*, 12 Ben.Rev.Bd. Serv. (MB) 691, 695 (1980); *Walker v. Washington Metropolitan Area Transit Authority*, 793 F.2d 319, 321–23 (D.C.Cir. 1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 162 (1987). A disabled worker's post-injury earnings can only "fairly and reasonably represent his wage-earning capacity," § 8(h), if they have been converted to their equivalent at the time of injury. This adjustment should have been made in the determination of residual wage-earning capacity under § 8(h), which authorizes the ALJ, "in the interest of justice, [to] fix such wage-earning capacity as shall be reasonable[.]"

*Failure to Award a* De Minimis *Grant*

 The Board denied LaFaille's claim for a *de minimis* award, holding that such awards are judicially created extensions of the § 22 LHWCA, 33 U.S.C. § 922, modification period which are not authorized by the Act. General Dynamics maintains that the Board was correct in this holding. LaFaille and the Director argue, and we agree, that the Board erred in failing to award him a *de minimis* award under § 8(c)(21).

Section 22 provides that an award that denies continuing compensation may be modified at any time within one year after the last payment of compensation on the ground either of a "change in conditions" since the order or of mistake in the original determination of disability. Thus, "[a]n initial finding of no economic disability ... may only be modified within one year of such finding, even though subsequent events make it apparent that the claimant has suffered severe economic harm." *Hole v. Miami Shipyards Corp.,* 640 F.2d 769, 772 (5th Cir.1981).

Because of the "potentially harsh effect of this relatively short statute of limitations," where a physically impaired worker's potential right to compensation for the substantial loss of future earnings is a predictable probability, even if it is not a certainty at the time of hearing, *de minimis* awards have been approved in order to avoid the short statute of limitations of § 22. *Id.* The court in *Hole* expressly held that concern for the avoidance of an irremediable error precluding future relief is appropriate under the LHWCA and under § 8(h). Similarly, in *Randall v. Comfort Control, Inc.,* 725 F.2d 791 (D.C.Cir. 1984), the court not only agreed with *Hole* that such awards were permissible, but also held that they should be made where the evidence shows a significant permanent physical impairment without a present loss of earnings.

Because the ALJ found that LaFaille sustained a "permanent injury, a progressive obstructive lung disorder," "[was] restricted in performing some of the physical aspects of the job of welder" and was spared demanding physical exertion by the kindness of his employer and co-workers in his job after he left General Dynamics, there is substantial evidence that he is likely to suffer a future loss of earnings as his condition deteriorates or when his environment changes. A finding of no economic disability and a denial of a *de minimis* award would prevent him from filing for future benefits for losses in earning capacity occurring after the one-year limitation of § 22.

In the event that the ALJ finds, on a proper § 8(h) determination, that LaFaille did not suffer an actual loss in wage-earning capacity at the relevant dates, his case falls within *Hole* and *Randall,* and the ALJ should award him a *de minimis* periodic payment under § 8(c)(21).

Reversed and remanded.